## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATAL BAKHTANI<br><br>*Petitioner-Plaintiffs*,<br><br>v.<br><br>TAMMY MARICH in her official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; JOSEPH FREDEN, in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility; TODD LYONS, in his official capacity as Acting Director U.S. Immigration and Customs Enforcement; and KRISTI NOEM, in her official capacity as U.S. Secretary of Homeland Security; U.S. Department of Homeland Security and U.S. Immigration,<br><br>*Respondents-Defendants*. | Case No.<br><br>**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT** |

## <u>INTRODUCTION</u>

1.  This case is about Petitioner Atal Bakhtani, ("Atal" or "Petitioner"), is a thirty (30) year-old man who was arrested and re-detained with any notice or warning on December 8, 2025 in the morning by Respondents, Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) ("ICE" or "government").  At the time of his arrest, Atal was with his five (5) year old daughter who was preparing to be taken by a school bus to kindergarten while his wife and three (3) month old baby were inside the family home.  Atal, who is from Afghanistan, came to the United States to seek safety for himself and his family.

2.  Until his sudden arrest and re-detention and without any prior notice or warning on December 8, 2025, Atal was living with his wife and children in the Albany, New York area. Atal and his family entered the United States lawfully and through a rigorous screening process. They were screened and processed by the U.S. government during their July 20, 2023, appointment at the San Ysidro, California port-of-entry through "CBP One". CBP One was a mobile application that noncitizens could utilize to request appointments for inspection and admission into the United States.[1]

3.  Atal has never been arrested, charged, or accused of any criminal conduct. Atal does not present a flight risk whatsoever, as demonstrated by his family and community ties to the United States and has a meritorious claim for asylum.

4.  Atal respectfully asks this Court to hold that his arrest was unlawful, to hold that his continued detention is unlawful, and to order his release from custody. Atal also respectfully asks that this Court order Respondents not to transfer him outside of the District for the duration of this proceeding.

## **PARTIES**

5.  Petitioner Atal Bakhtani is a 30-year-old Afghan national who entered the United States pursuant to parole through the "CBP One" mobile application. Prior to his unnoticed arrest and detention, Atal was living with his wife and two children in the Albany, New York area and working with a valid work authorization issued by the United States government. Atal Bakhtani has a pending I-589 application for asylum, withholding and CAT.

---

[1] U.S. Customs and Border Protection, *CBP One Fact Sheet* (January 2023)
https://www.cbp.gov/sites/default/files/assets/documents/2023-Jan/CBP%20One%20Fact%20Sheet_English_3.pdf

6.  Respondent Tammy Marich is sued in her official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement ("ICE"). Respondent Marich is a legal custodian of Atal.

7.  Respondent Joseph Freden is sued in his official capacity as Deputy Field Office Director of the Buffalo Federal Detention Facility. Respondent Freden is a legal custodian of Atal.

8.  Respondent Todd Lyons is sued in his official capacity as Acting Director of ICE. As the Acting Director of ICE, Respondent Lyons is a legal custodian of Atal.

9.  Respondent Kristi Noem is sued in her official capacity as Secretary of Homeland Security. As the head of the DHS, the agency tasked with enforcing immigration laws, Secretary Noem is Atal ultimate legal custodian.

10. Respondent DHS is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(f)(1). Its components include ICE and USCIS.

11. Respondent ICE is a component of DHS that enforces immigration laws and oversees the arrest, detention, and removal of noncitizens.

## JURISDICTION, VENUE AND EXHAUSTION

12. This Court has jurisdiction under the U.S. Constitution. U.S. Const. art. I § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require.")

13. The Court also has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (the All-Writs Act); 28 U.S.C. § 2241 (habeas corpus); and 5 U.S.C. § 701 (the Administrative Procedure Act).

14. This Court has additional remedial authority under 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act), to grant injunctive and declaratory relief.

15. Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this district.

16. Venue is also proper under 28 U.S.C. § 2241(d) because Atal is detained at a facility within this district.

17. Administrative exhaustion is unnecessary because it would be futile.

## CAMPAIGN TARGETING AFGHAN NATIONALS

18. On November 26, 2025, authorities identified an Afghan National as the suspect in the shooting of two National Guard members in Washington D.C.[2]

19. Thereafter, upon information and belief, Respondents instructed their agents to specifically target Afghan citizens for arrest and detention by immigration enforcement, regardless of whether they had any connection to the shooting.[3] During at least one of such arrests, the arresting agents stated that they were detaining "because of the shooting."[4] A flurry of proposed policy changes and legislation followed the shooting, increasing vetting of all Afghan evacuees in the United States.[5]

20. During the week of December 2, 2025, Atal was among at least ten other Afghans in the New York Capital Region who were arrested and placed into immigration detention. This included Atal's father and two brothers. *See* X case.

---

[2] Eric Bazail-Eimil, Politico "Republicans drop support for Afghan wartime allies after National Guard shooting (Dec. 18, 2025) *available at* https://www.politico.com/news/2025/12/18/republicans-drop-support-afghans-asylum-00697430.

[3] Los Angeles Times, "After National Guard Shooting, Administration Cracks Down on Legal Immigration" (Dec. 8, 2025) *available at* https://www.aol.com/news/national-guard-shooting-administration-cracks-160823821.html. ("They told her they would have to detain him because of the shooting of two National Guard members a week earlier in Washington, D.C. 'He has nothing to do with that shooting,' Nyazi, 27, recalled answering. 'We don't even know that person.'); Sahar Akbarzai *et al* Associated Press, "ICE arrests of Afghans are on the rise following D.C. National Guard attack, immigration lawyers say" (Dec. 10, 2025), *available at* https://www.pbs.org/newshour/politics/ice-arrests-of-afghans-are-on-the-rise-following-d-c-national-guard-attack-immigration-lawyers-say.

[4] *Id*.

[5] USCIS *Newsroom, USCIS Implements Additional National Security Measures in the Wake of National Guard Shooting by Afghan National* (November 27, 2025), *available at* https://www.uscis.gov/newsroom/news-releases/uscis-implements-additional-national-security-measures-in-the-wake-of-national-guard-shooting-by; Josh Hawley (R-Mo.) Afghanistan Vetting and Accountability Act available at https://www.hawley.senate.gov/hawley-introduces-bill-to-mandate-vetting-of-all-afghan-evacuees-after-deadly-attack-on-dc-national-guard/.

21. Upon information and belief, few or none of the arrested individuals had criminal records.

<u>**RELEVANT FACTS AND PROCEDURAL HISTORY**</u>

22. Atal was born in 1995 in Nangarhar, Afghanistan. Atal is one of eight children, six of which are currently in the United States. Atal's parents have been married for forty (40) years and reside in the United States.

23. Atal had a prosperous childhood and after compulsory education he received his bachelor's degree in English literature from Edrak University on June 27, 2020. He was employed at his family's educational institute as an English Teacher. His family's institute ("The Institute") was an educational center where men and women were taught English and various computer skills. Once the Taliban assumed power over Afghanistan on August 15, 2021, institutes such as the ones Atal worked for were immediately targeted. The Taliban thereafter sent several threat letters to Atal and his family, and one day the threats escalated to physical harm. In summer 2021, the Taliban entered The Institute by force and attacked Atal and other members of his family. In addition to the events related to their institute, two of Atal's brothers were targeted by the Taliban due to their employment for companies that worked in collaboration with the United States government.

24. Atal, his wife and daughter came to the United States seeking protection. Not only did Atal experience persecution in Afghanistan, but his wife also suffered threats as her father was an officer of the National Directorate of Security ("NDS") in the former Afghan government. Atal and his family presented themselves before United States Customs and Border Protection ("CBP") officials at an official port of entry after using the "CBP One" mobile application on their phone in order to be allowed to enter the United States. Atal and his family were then scheduled a date to enter the United States and they entered at the San Ysidro, California port of entry on July 20, 2023 - a date that was scheduled by CBP.

25. Upon presentation at the port of entry, Atal and his family were detained.  Following their detention, Atal and his family were subjected to examination by government officials who determined-correctly-that Petitioner did not present a danger to the community, a security risk, or a risk of flight.

26. Based on Atal's individualized facts and circumstances, he was granted permission to lawfully enter the United States (also known as being "paroled into") the United States for two years while he pursued any immigration relief available to him. Atal was permitted to lawfully enter and remain in the United States on July 20, 2023 until July 18, 2025. DHS also initiated immigertion removal proceedings under 8 U.S.C. § 1229a.

27. Atal and his family sought shelter in San Francisco, California, funded by an organization called Jewish Family Services upon arrival to the United States. Atal was directed to appear for his first immigration court hearing in San Francisco, California on November 3, 2025. The San Francisco, California court, however, approved Atal's request to change venue to Buffalo, New York on May 19, 2025. Atal's move was prompted by the need to reunite with the rest of his family – including Atal's parents and siblings. Atal's parents and siblings are also in immigration court proceedings seeking asylum for their involvement in The Institute and the threats that followed.

28. After the change of venue, the Buffalo, New York immigration court scheduled Atal's first master calendar hearing for September 18, 2025. On July 14, 2025, Atal's immigration court hearing was cancelled and a scheduling order was issued for pleadings. After obtaining *pro bono* legal services, Atal, by and through his counsel, applied for asylum, withholding of removal and protection under the Convention Against Torture on July 14, 2025. On August 13, 2025, Atal provided written pleadings to the immigration court. On October 23, 2025, another scheduling order was issued – this time reflecting Atal's readiness for trial and indicating a hearing notice

would be sent in the future. Prior to Atal's arrest, his immigration case was in the 'que' awaiting a trial date.

29. In Albany, New York, at least ten Afghans were arrested in one week – including Atal's two brothers and his father.[6] Indeed, Atal's father and one of his brother's were arrested and detained on December 8, 2025, in front of their local mosque after morning prayer. Then, Atal's younger brother was arrested and detained in front of his home on the same day. Atal's mother was sent to the emergency room due to the stress of the arrests.

30. Subsequently, on the morning of December 8, 2025, Atal was arrested and re-detained without any prior notice or warning,

31. Since Atal's arrest, his wife has experienced significant financial and emotional hardship. She is taking care of a five-year-old and a 3-month-old alone and does not have full-time employment. Notably, Atal's eldest daughter is severely traumatized by her father's arrest and has since withdrawn from any social interactions and has exhibited a loss of appetite. His eldest daughter cries everyday and Atal's wife has recently contacted the school counselor to seek assistance for her daughter's mental health needs.

32. The only changes in Atal's life were positive: he gained ties to the community, and his wife gave birth to their three-month-old-child, who is now left in the sole care of her mother due to Atal's detention.

33. To further complicate matters, upon arrival to BFDF, Respondents did not hesitate to quickly file a Motion to Pretermit Atal's entire asylum case and attempt to deport him to Uganda under a new

---

[6] Times Union, *Multiple Afghans arrested by Ice in Albany amid crackdown after D.C. shooting* (December 3, 2025) https://www.timesunion.com/news/article/afghans-arrested-ice-albany-amid-crackdown-d-c-21221084.php; *Churchill: The Crackdown on Afghan Refugees hits close to home* (Dec. 9, 2025) ehttps://www.timesunion.com/churchill/article/crackdown-afghan-refugees-hits-close-to-home-21230019.php

Asylum Cooperative Agreement ("ACA") between the United States and Uganda- a country which Atal has never been to or knows anything about.

## LEGAL FRAMEWORK

### I.  Petitioner's Detention Violates His Right to Substantive Due Process Because He Is Neither A Flight Risk Nor a Danger to the Community

34. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Noncitizens unquestionably have a substantive liberty interest to be free from detention.  Because "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," the government may imprison people as a preventive measure only within strict limits. *Foucha v. Louisiana*, 504 U.S. 71, 83 (1992) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).

35. Immigration detention is civil and must "bear[] a reasonable relation to the purpose for which the individual [is] [detained]" so that it remains "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690 (cleaned up); *see also Schall v. Martin*, 467 U.S. 253, 264-69 (1984) (finding detention must be a proportional—not excessive—response to a legitimate state objective).

36. Courts have identified only two legitimate purposes for immigration detention: mitigating flight risk pending removal and preventing danger to the community. *See Zadvydas,* 533 U.S. at 690-91; *Velasco Lopez v. Decker*, 978 F.3d 842, 854 (2d Cir. 2020); *Faure v. Decker*, No. 15-CV-5128, 2015 WL 6143801, at *3 (S.D.N.Y. Oct. 19, 2015) (ordering release or a bond hearing where there was "no evidence" that the habeas petitioner "poses a danger to the public or would flee during the pendency of the removal proceedings").

37. Neither purpose is served by Atal's re-detention. Respondents have not made any claim that Atal presents a flight risk or a danger to the community nor could they. Accordingly, the government

is not detaining Atal to serve its legitimate interests in protecting against danger or flight risk. Because detention on that basis bears no "reasonable relation" to the government's interests in preventing flight and danger, *Jackson v. Indiana*, 406 U.S. 715, 738 (1972), this Court should order his release.

**II.  Petitioner's Re-arrest and Re-Detention Without An Opportunity to Seek Release From a Neutral Decisionmaker Violates His Right to Procedural Due Process And Necessitates Release From Civil Immigration Detention**

38. Even "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *Salerno*, 481 U.S. at 746; *see also, Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137  (W.D.N.Y. May 2, 2025); *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 362-64, 373 (S.D.N.Y. 2019) (finding the detention of a noncitizen without written notice of the reinstatement of a removal order violated procedural due process and therefore ordering his release and enjoining the government "from attempting to detain Petitioner, while the outcome of his immigration proceedings are pending, so long as he is ably cooperating and participating in his proceeding"); *Lopez v. Sessions*, No. 18-CV-4189, 2018 WL 2932726, at *11 (S.D.N.Y. June 12, 2018).

39. "The Supreme Court long ago held that the Fifth Amendment entitles noncitizens to due process in removal proceedings." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024). The three-factor test articulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976) provides the relevant framework "to determine what process is due to noncitizens in removal proceedings," *Black*, 103 F.4th at 147 (collecting cases), and confirms his entitlement to a hearing. The *Mathews* factors are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest,

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

40. The first *Mathews* factor weighs heavily in Atal's favor. The Second Circuit has repeatedly held in challenges to immigration detention that "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Black*, 103 F.4th at 151 (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)). Atal's ongoing detention directly and substantially implicates this "most significant liberty interest . . . '[C]ase after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.''" *Id.* (quoting *Velasco Lopez*, 978 F.3d at 851 and *United States v. Salerno*, 481 U.S. 739, 755 (1987) (cleaned up)); *Campbell v. Almodovar*, No. 1:25-cv-09509 (JLR), 2025 WL 3538351, *11 (S.D.N.Y Dec. 10, 2025)(finding Petitioner's private interest outweighed other factors where there was no "individualized determination of his flight risk or dangerousness"). Like the petitioner in *Velasco Lopez*, the deprivation Atal is experiencing "was not the result of a criminal adjudication." 978 F.3d at 851. Nor, like the Petitioner in *Campbell*, was it the result of any flight risk or danger. 2025 WL 3538351, at **11-12.

41. Atal also has a strong liberty interest in light of his prior grant of parole. *Morrissey v. Brewer*, 408 U.S. 471, 482-483 (1972). In *Morrissey*, the Supreme Court examined the "nature of the interest" that a parolee has in "his continued liberty." 408 U.S. at 481-82. The Court noted that, "subject to the conditions of his parole, [a parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id.* at 482. The Court further highlighted that "the parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* The Court explained that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often others."

*Id.*; *see also Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017) ("[A] person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process before he is re-incarcerated.").

42. Numerous courts have found a similar liberty interest to be held by noncitizens released from detention on bond and have noted that this interest only "grows over time." *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *5 (N.D. Cal. July 17, 2025); *see also Diaz v. Kaiser*, No. 3:25-CV-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Jorge M. F. v. Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021); *Doe v. Becerra*, No. 25-cv-00647-DJC-DMC, 2025 WL 691664, at *5 (E.D. Cal. March 5, 2025); *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019).

43. The interest in remaining free may be even stronger in a case, like Atal's, where the government had made an initial determination to release him from custody on parole, without even the need for a bond. *See Campbell*, 2025 WL 353851, at **10-11.

44. As for the second *Mathews* factor, the erroneous deprivation of Atal's liberty is the direct result of the insufficient safeguards and procedures used to initiate and continue his detention. The government purports to detain without review under the authority of 8 U.S.C. § 1225(b). Section 1225(b), like the mandatory detention at issue in *Black*, "include[s] no mechanism for a detainee's release, nor for individualized review of the need for detention." 103 F.4th at 152. Such a lack of "procedural protections . . . markedly increase[d] the risk of an erroneous deprivation of Petitioners' private liberty interests." *Id*. When evaluating the second *Mathews* prong, "[t]he only interest to be considered . . . is that of the detained individuals—not the government." *Black*, 103 F.4th at 152.

45. The fact that the Government had already determined Atal did not present a risk to national security nor of flight, is "irreconcilable with the decision to re-arrest him, absent changed

circumstances." *Lopez*, 2018 WL 2932726, at \*11. In *Lopez,* the court held that due to the lack of process prior to the petitioner's re-arrest, "the risk of erroneous deprivation of Mr. Lopez's liberty interest is manifest." *Id.* As such, "Petitioner's re-detention, without prior notice, a showing of changed circumstances, or a meaningful opportunity to respond, does not satisfy the procedural requirements of the Fifth Amendment." *Id.* at 12.

46. The Western and Southern Districts of New York have agreed—the Southern District in *Campbell* contemplated that a petitioner in Atal's position must be given meaningful pre-deprivation process before he could be re-detained. *See* 2025 WL 3538351, at \*11; *see also Guillermo M.R.*, 2025 WL 1983677, at \*7 (noting that the court could not "identify any other context in which government agents could permissibly take someone who has been released by a judge, lock up that person, and have no hearing either beforehand or promptly thereafter"); *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (noting that the Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property") (emphasis in original); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 146 (W.D.N.Y July 16, 2025) (explaining the importance of due process owed prior to parole revocation); *Ceesay*, 781 F. Supp. 3d, at 157 (noting that "courts have repeatedly recognized the importance of process, particularly where, as here, a person's freedom stands in the balance").

47. Here, the risk of erroneous deprivation is particularly high because Atal was re-detained absent a change in circumstances. The Hon. Jennifer L. Rochon's decision in *Campbell* is highly instructive on this very issue. 2025 WL 353835, at \*\*10-12 (holding that Respondents violated Petitioner's due process rights by re-arresting him after his parole had expired without change in circumstance) (citing *Valdez v. Joyce*, No. 25-cv-04627 (GBD), 2025 WL 1707737, at \*4 (S.D.N.Y. June 18, 2025)). Like the Petitioner in *Campbell*, here, there is no record evidence of an individualized determination for Petitioner's re-arrest. "In fact, nothing in the record reflects .

. . (1) who made the decision to detain him, (2) when that decision occurred, (3) on what basis the decision to detain was made, (4) whether there was any material change in circumstances with respect to [Atal] that triggered his detention, or (5) whether there was any sort of new policy in place that triggered his detention. *Id.* at 11 (citing *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 485 (S.D.N.Y. 2025)). The Southern District noted "[t]he utter lack of transparency here is problematic, to say the least, as it makes it impossible to determine why Atal was detained. *Lopez Benitez*, 795 F. Supp. 3d at 494. Such utter lack of process, especially when considered with evidence of a campaign to detain Afghan Nationals as discussed *infra*, leaves no explanation for Atal's re-detention other than his national origin.

48. The third *Mathews* prong—the public interest—also weighs in Atal's favor. As explained *supra*, the government has no legitimate interest in detaining anyone who is not a flight risk or a danger to the community. *Zadvydas*, 533 U.S. at 690. The government already determined that Atal was not either, and it has not indicated that there are any changed circumstances that could justify his re-detention. Like the petitioner in *Campbell,* there is substantial record evidence that Atal is not a flight risk or a danger to the community. *See Campbell*, 2025 WL 353835, at **12-13. Namely, he has resided in the United States for more than two years, has filed for asylum, obtained work authorization, provided updated address information, established community ties in New York, and maintained a clean record. *Id*. It also bears noting that the "fiscal and administrative burdens" that would be imposed by Atal's release from custody, unless and until a pre-deprivation hearing is provided, are nonexistent in this case. *See Mathews*, 424 U.S. at 334-35.

49. Ultimately, then, because the release of Atal pursuant a process that involved a determination that he was neither flight risk nor national security risk and that it was appropriate for him to pursue asylum from outside of ERO custody, "Petitioner's re-detention, without prior notice, a showing of changed circumstances, or a meaningful opportunity to respond, does not satisfy the procedural

requirements of the Fifth Amendment." *Lopez*, 2018 WL 2932726, at *12.  *See also, Qasemi v. Francis*, No. 25-cv-10029, 2025 WL 3654098 at **12-13 (S.D.N.Y Dec. 17, 2025)

**III. Petitioner is Neither a Danger to the Community Nor a Flight Risk and There are No Change in Circumstances that Could Legally Justify his Re-Arrest on December 2, 2025**

50. Detention based strictly on national origin and for any purpose other than flight risk, danger, or imminent removal—particularly of a law-abiding individual whose application for asylum remains pending and has complied with all requirements placed on him—violates the equal protection clause of the United States Constitution.

51. The "liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws [. . .] [T]he equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved." *United States v. Windsor*, 570 U.S. 744, 774 (2013)(emphasis added).

52. The United States Supreme Court has made clear that the protections of the Fourteenth Amendment's Equal Protection Clause are "precisely the same" as the Equal Protection guarantees under the Fourteenth Amendment. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995).

53. Put simply, Equal Protection "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr*., Inc., 473 U.S. 432, 439 (1985).

54. The government's actions violate this directive when, for example, an otherwise neutral law or policy is applied in a discriminatory manner. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886).

55. As discussed *supra*, in the wake of the shooting of two national guard members on November 26, 2025, the government rapidly expanded its targeting of Afghan nationals. During at least one of the documented arrests of Afghan nationals, on information and belief, the arresting agent even

indicated to an Afghan national in New York state that he was being arrested because of the shooting, without any evidence of connection to the shooter.[7]

56. Atal, his father and brothers were all arrested shortly after the this shooting, in a sweep of at least ten other Afghan nationals detained in the same geographical region and in close temporal proximity. No individualized evidence of risk of flight or dangerousness was made to arrest and re-detain Atal and there was no change in circumstance after the government had already determined he did not pose a risk of flight or to national security interests when Respondents released him two years before.

57. Upon information and belief, Respondents targeted Atal for arrest and detention because he is and Afghan national. Detention based on national origin is unconstitutional and warrants immediate release.

**IV. Petitioner's Re-Arrest Violated the Fourth Amendment to the U.S. Constitution (unlawful arrest); 5 U.S.C. §§ 702, 706**

58. At the time of Atal's arrest, he had been living at liberty pursuant to a determination by federal immigration authorities.

59. The government lacked reliable information of changed or exigent circumstances that would justify his arrest after federal immigration authorities had already decided he could pursue his claims for immigration relief at liberty. His re-arrest is unreasonable and violates the Fourth Amendment.

60. It is unreasonable under the Fourth Amendment to rearrest a person who has been released from custody based on the same charge that supported the earlier arrest. The Fourth Amendment

---

[7] Los Angeles Times, "After National Guard Shooting, Administration Cracks Down on Legal Immigration" (Dec. 8, 2025) *available at* https://www.aol.com/news/national-guard-shooting-administration-cracks-160823821.html. ("They told her they would have to detain him because of the shooting of two National Guard members a week earlier in Washington, D.C. 'He has nothing to do with that shooting,' Nyazi, 27, recalled answering. 'We don't even know that person.')

protects the right of the people to be secure in their persons against unreasonable seizures. U.S. Const. Amend. IV. "It is axiomatic that seizures have purposes." *Williams v. Dart*, 967 F.3d 625, 634 (7th Cir. 2020). "When those purposes are spent, further seizure is unreasonable." *Id.* Any seizure must be supported by probable cause, which is "strictly tied to and justified by the circumstances which rendered [the initiation of the seizure] permissible." *Terry v. Ohio*, 392 U.S. 1, 18 (1968) (quoting *Warden v. Hayden*, 387 U.S. 294, 310 (1967) (Fortas, J., concurring)); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). When the purpose of a seizure is accomplished, "[f]urther seizure requires a court order or new cause" as "the original probable cause determination is no justification." *Williams*, 967 F.3d at 634.

61. This requirement "guards against precipitate rearrest." *Carlson v. Landon*, 342 U.S. 524, 546-47 (1952). "Arrest ensures that a suspect appears to answer charges and does not continue a crime, and it safeguards evidence and enables officers to conduct an in-custody investigation." *Virginia v. Moore*, 553 U.S. 164, 173 (2008); *Albright v. Oliver*, 510 U.S. 266, 278 (1994) (same) (Ginsburg, J., concurring); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) (same). When an individual is released on bond, bail, parole, or their own recognizance pending the result of their proceedings, the purpose of their prior arrest has been accomplished. *Williams*, 967 F.3d at 634. As a result, any probable cause justifying the prior arrest is extinguished, and they cannot be rearrested absent changed circumstances. *See Carlson*, 342 U.S. at 546-47; *United States ex rel. Heikkinen v. Gordon*, 190 F.2d 16, 19 (8th Cir. 1951); *United States v. Holmes*, 452 F.2d 249, 260-61 (7th Cir. 1971); *United States v. Swims Under*, 990 F.2d 1265 (table), 1993103768, at *2 (9th Cir. 1993); cf. *Saravia*, 280 F. Supp. 3d at 1176 ("Once a noncitizen has been released, the law prohibits federal agents from re-arresting him merely because he is subject to removal proceedings.").

62. Here, at the moment of seizure, Atal (a) had a pending and timely filed application for asylum, withholding of removal, and protection under the Convention Against Torture and (b) had pending proceedings under INA § 240 and had dutifully complied with filing and attendance requirements for such proceedings; and (c) was at his stable home address in the morning with his two children and wife and his arrest and re-detention occurred when his young daughter-5 years old-was about to go to Kindergarten.

63. As such, no changed circumstances applied to Atal's case, and the government did not have probable cause to justify his re-arrest after the prior, extinguished arrest. Now, two years later, without any change in circumstance, Atal was arrested despite not being a danger to the community or a flight risk.

64. By statute and regulation, the Government can only make arrests where the officer has reason to believe that the individual is in the United States in violation of immigration laws *and* is likely to escape before a warrant can be obtained for his arrest." (citation modified) (citing § 1357(a)(2); §287.8(c)(2)(ii)). *Ramirez Ovando v. Noem*, --- F.Supp.3d ----2025 WL 3293467 (D. Colo. Nov. 25, 2025), at *2. Here, at minimum, the Government did not have an indication that Petitioner was an escape-risk when he was released by DHS more than two years prior to his unnoticed arrest and detention on December 8, 2025, and has (and continues to have) a pending application for protection from removal before EOIR.

## CAUSES OF ACTION

## FIRST CLAIM

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Substantive Due Process); 5 U.S.C. §§ 702, 706**

65. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

66. Atal is not a flight risk nor is he a danger to the community. Respondents' re-detention of Atal is therefore unjustified and unlawful. Accordingly, Atal is being detained in violation of his Constitutional right to substantive Due Process under the Fifth Amendment.

<u>**SECOND CLAIM**</u>

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution (Procedural Due Process); 5 U.S.C. §§ 702, 706**

67. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

68. The Due Process Clause of the Fifth Amendment protects all "person[s]" from deprivation of liberty "without due process of law."

69. The government made the reasoned decision to parole Atal from detention while he pursued his asylum claim in the United States. The Due Process Clause entitles Atal to meaningful process assessing whether his detention is justified. The arrest and detention of Atal without an opportunity for Atal to contest his detention in front of a neutral decisionmaker after he had been living and working in the United States for over two years provides insufficient process and violates the procedural Due Process Clause of the Fifth Amendment of the Constitution.

<u>**THIRD CLAIM**</u>

**Violation of the Fourth Amendment to the U.S. Constitution (unlawful arrest); 5 U.S.C. §§ 702, 706**

70. Petitioner repeats, re-allege, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

71. At the time of Atal's arrest, he had been living at liberty after being released by federal immigration authorities for more than two years. He was living peacefully with his wife and their two young children-one of whom was on her way to Kindergarten when Atal was arrested.

72. The government lacked reliable information of changed or exigent circumstances that would justify his arrest after federal immigration authorities had already decided he could pursue his claims for immigration relief at liberty. His re-arrest based is unreasonable and violates the Fourth Amendment.

### <u>FOURTH CLAIM</u>

**Violation of the Fifth Amendment to the U.S. Constitution
(Equal Protection Clause)**

73. Petitioner repeats, re-allege, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

74. The U.S. Constitution guarantees the Equal Protection of the law and bars discrimination on the basis of national origin. *See Yick Wo*, 118 U.S. at 373-74.

75. The protections of Equal Protection are exactly the same under the Fifth and Fourteenth Amendments. *See Adarand Constructors, Inc.*, 515 U.S. at 217.

76. On November 26, 2025, officials identified an Afghan National as the suspect in the tragic shooting of two National Guard officers. Thereafter, restrictive policies foreclosed pathways to lawful status for Afghan nationals, and an apparent campaign to detain Afghan nationals began. Upon information and belief, in the days following the shooting, at least 10 Afghan Nationals, without criminal record, were detained miles away in New York's capital region alone.

77. Upon information and belief, Petitioner was caught in this sweep. Residing in the United States with a pending application for asylum, withholding of removal, and protection under the Convention Against Torture with his wife and two young children and after DHS had determined he was not a risk of flight or risk to national security, Petitioner's re-arrest occurred just days after the shooting.

78. Atal is a 30-year-old Afghan national with no criminal history – he posed neither a flight risk nor a danger to the community.

79. Upon information and belief, his sudden arrest can only be based on one illegitimate government motive – his national origin.

80. Upon information and belief, because his arrest and detention are based on his national origin and not on any legitimate government interest, his detention is unlawful.

## FIFTH CLAIM

**Violation of the Immigration and Nationality Act and Implementing Regulations
(Unlawful Application of Detention under8 U.S.C. § 1225(b)**

81. Petitioner repeats, re-allege, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

82. Upon information and belief, Respondents are currently detaining Atal pursuant to 8 U.S.C. §1225(b).

83. However, Atal at the time of his re-detention by Respondents, was not seeking admission to the United States.

84. Therefore, the application of 8 U.S.C. §1225(b) to Atal is unlawful.

## SIXTH CLAIM

**Violation of the Administrative Procedures Act – 5 U.S.C. §§ 702, 706(2)(A)
Abuse of Discretion**

85. Petitioner repeats, re-allege, and incorporates by reference each allegation in the preceding paragraphs as if fully set forth herein.

86. Under the APA, a court shall "hold unlawful and set aside agency action" that is an abuse of discretion.

87. An action is an abuse of discretion if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Assn of Home Builders v. Defs. Of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

88. To survive an APA challenge, the agency must articulate "a satisfactory explanation" for its action, "including a rational connection between the facts found and the choice made." *Dep't of Com. v. New York.*, 139 S Ct. 2551, 2569 (2019) (citation omitted).

89. Respondents have already considered Petitioner's facts and circumstances and determined that he was not a flight risk or national security risk when he was released on parole more than two years prior to his unnoticed arrest and re-detention.

90. By revoking Petitioners' release without consideration of their individualized facts and circumstances, Respondents have violated the APA.

## **PRAYER FOR RELIEF**

Wherefore, H.A. respectfully requests this Court to grant the following:

    a.  Assume jurisdiction over this matter;

    b.  Enjoin the Respondents from transferring Petitioner away from the jurisdiction of this District pending these proceedings or, in the alternative, ordering Respondents to provide

Petitioner's counsel 72-business hours' notice prior to any scheduled transfer;

c.  Declare that Respondents' detention is unconstitutional, violating due process, the Fourth Amendment, the Equal Protection Clause, and the APA;

d.  Issue an Order to Show Cause ordering Respondents to show cause why this Petition should not be granted within three days;

e.  Issue a Writ of Habeas Corpus ordering Respondents to immediately release Petitioner from custody without restraints on his liberty beyond those that existed prior to his unlawful re-detention;

f.  Award Petitioner his costs and reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412; and,

g.  Grant such further relief as the Court deems just and proper.

| | |
|---|---|
| Dated: December 23, 2025<br>New York, N.Y. | Respectfully submitted,<br><br>/s/ Sarah T. Gillman<br>Sarah T. Gillman<br>ROBERT & ETHEL KENNEDY HUMAN RIGHTS CENTER<br>88 Pine St., 8th Fl., Ste. 801<br>New York, NY 10005<br>T: (646)289-5593<br>E: gillman@rfkhumanrights.org<br><br>/s/ Sarah E. Decker<br>Sara E. Decker<br>ROBERT & ETHEL KENNEDY HUMAN RIGHTS CENTER<br>1300 19th Street NW, Ste. 750<br>Washington, DC 20036<br>T: (646) 289-5593<br>E: decker@rfkhumanrights.org<br><br>/s/ Jhoanna Sylio<br>Jhoanna Sylio, Esq. Litigation Attorney<br>Prisoners' Legal Services of New York 14<br>Lafayette Square, Suite 510<br>Buffalo, NY 14203 |

| | Tel.: 716-844-8266 |
| | Fax: 716-854-1008 |
| | Email: jsylio@plsny.org |
| | |
| | *Pro bono counsel for Petitioner* |

## 28 U.S.C. § 2242 VERIFICATION STATEMENT

I am submitting this verification on behalf of the Petitioner because I am one of the Petitioner's attorneys. I have discussed with the Petitioner the events described in this Petition and Complaint. On the basis of those discussions, I hereby verify that the statements made in this Petition and Complaint are true and correct to the best of my knowledge.


Dated: December 23, 2025                           /s/ Sarah T. Gillman
New York, NY                                   Sarah T. Gillman
                                            ROBERT & ETHEL KENNEDY HUMAN RIGHTS CENTER
                                            88 Pine St., 8th Fl., Ste. 801
                                            New York, NY 10005
                                            T: (646)289-5593
                                            E: gillman@rfkhumanrights.org